IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

PATRICK GENTRY                                                        PLAINTIFFS

V.                                    CASE NO. 3:17-CV-3008

MOUNTAIN HOME SCHOOL DISTRICT                                        DEFENDANT

<u>MEMORANDUM OPINION AND ORDER</u>

Now pending before the Court are a Motion for Summary Judgment (Doc. 34), Statement of Facts (Doc. 35), and Brief in Support (Doc. 36), filed by Defendant Mountain Home School District ("the District"); a Response in Opposition to the Motion (Doc. 37), Brief in Support (Doc. 38), and Response to Statement of Facts (Doc. 39), by Plaintiff Patrick Gentry; and the District's Reply (Doc. 42). For the reasons set forth herein, the Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.

## I. BACKGROUND

On January 20, 2014, Plaintiff Patrick Gentry, who was then a senior at Mountain Home High School, and a female student named Jamie Boelkens were seated in the auditorium of the school waiting for a program to begin, when they began discussing a teacher who had given them each a "B" in his class. The two students thought they had earned "A" grades.[1] The teacher they were discussing was Coach Ronnie Blevins, and the class in question was a college preparatory course called "Capstone." At some point, another student named Sarah Ross joined in Jamie's and Patrick's conversation. Sarah allegedly suggested that they report Coach Blevins to the office and write the letter "B" in

---

[1] In fact, Patrick had made an "A" in every class that semester, except this one. (Doc. 34-13, p. 7).

chalk on his car; Jamie suggested they burn down his house; and Patrick suggested that they pour pigs' blood over his daughter at prom, just as in a scene from the horror movie *Carrie*. Patrick and Jamie maintain that this conversation was very brief, and that they were only joking and had no intention of following through on any of these threats.

A couple of days later, on January 22, 2014, Patrick was called to the office and interrogated by Vice Principal Kyle McCarn and School Resource Officer Chester "Bubba" Jones concerning the statements Patrick had made about Coach Blevins and/or his daughter. Then Patrick's mother arrived at school and was advised both orally and in writing that Patrick would be suspended for ten days. Jamie received the same punishment. The discipline slip for Patrick listed the reason for the suspension as "abusive or threatening behavior." *See* Doc. 34-4. Patrick was also advised by Vice Principal McCarn that if he wanted permission to ask his teachers for the make-up work he missed during the suspension, he would need to complete ten days of community service. Finally, Patrick was asked which two teachers he wanted to serve on his disciplinary advisement committee, which would convene after he served his ten-day suspension. Patrick identified two teachers to serve on the committee, but he later testified that he was not told the purpose of the disciplinary advisement committee meeting, nor was the meeting referenced on his discipline slip. Patrick thought the committee was convening to verify he had completed his community service obligation.

On February 7, 2014, following the suspension, Patrick and Jamie returned to school along with their parents to meet with their respective disciplinary advisement committees. Both meetings took place on the same day, but Patrick's occurred first. The persons in attendance at Patrick's meeting were his parents; two of his teachers, Carol

2

Wegerer and Karen Maupin; Vice Principal McCarn and Vice Principal Lindsey Blevins;[2] and Jeff Kincade, the Director of the Guy Berry Alternative Learning Environment ("ALE"), which is an educational facility/intervention program affiliated with the Mountain Home School District, located on a campus apart from Mountain Home High School.

Prior to meeting with Patrick and his parents, the staff and administrators on Patrick's committee met separately with Mr. Kincade. After that private meeting, the committee invited the Gentrys in, and it soon became clear that the committee had decided that Patrick should be expelled. They offered one alternative to expulsion: mandatory enrollment in the ALE for the rest of the semester. Mr. Kincade was present at the meeting to explain to the Gentrys what the ALE was and what Patrick could expect if he chose to attend in lieu of expulsion.

In the course of the meeting, Patrick's parents informed the committee that they were concerned about sending Patrick to the ALE for a number of reasons. The ALE did not offer a college-preparatory curriculum, and the courses Patrick was in the middle of taking at Mountain Home High School were not offered at the ALE—including, for example, Spanish II and Linear Algebra. Patrick's parents did not feel assured that he would be able to complete these classes while attending the ALE. By that point, Patrick claims he had already been accepted to six colleges, see Doc. 18, p. 4, including his top choice, the University of Mississippi, which had offered him a scholarship, provided he could show proof that he was completing his graduation requirements—specifically his foreign language requirement. Patrick's parents understood that foreign language classes were

_____

[2] No relation to Coach Blevins.

3

not offered at the ALE. They were also worried about how Patrick's permanent record would be affected if he transferred to the ALE, and about whether his diploma would reference his graduation from the ALE, rather than from Mountain Home High School. Finally, Mrs. Gentry testified that they "were told he would have to wear a white jumpsuit" as a student of the ALE, and that even if Patrick were approved to take classes at Mountain Home High School, which was not assured, he "would be transported back and forth like a criminal . . . ." (Doc. 37-4, p. 9).

Mrs. Gentry supplied the Court with an affidavit that included further details about the February 7 committee meeting. She confirmed that she and her husband believed that placing Patrick in the ALE just before his graduation, based on his joking comment about a teacher's daughter, "was unacceptable." (Doc. 37-3, p. 3). Nevertheless, she understood "Patrick would be recommended for expulsion if [she and her husband] did not agree to send Patrick to the ALE," and that if they attempted to enroll him in a high school outside the district, "Patrick's permanent record would reflect either the recommendation for expulsion or assignment to the ALE, and this would follow him to any Arkansas school district." *Id.* In order to avoid the committee voting on the issue and making the decision final, Patrick and his parents walked out of the meeting, and the committee tabled its decision.

Immediately after Patrick's meeting ended, Jamie's disciplinary committee meeting began. The ALE director had not been invited to attend Jamie's meeting. According to Jamie's affidavit, her meeting was "short," and she "was allowed to return to school without any further punishment," despite having admitted to the committee that she had joked about burning down Coach Blevins's house. (Doc. 37-16, p. 2).

4

Since Patrick's committee meeting ended without a formal recommendation, Patrick and his parents contemplated moving him to another school district. The same day as the meeting, February 7, Patrick began completing a form provided to him by the high school called an Exit/Withdrawal Report (Doc. 34-10). This Report states that the reason Patrick was withdrawing from the District was that he was "moving to Bull Shoals—Enrolling in Flippin." *Id.* The form was signed by all required parties except Patrick's counselor. *See id.*

Because of the lack of all required signatures, and for other reasons that will be explained in the course of this Opinion, the parties currently disagree about whether Patrick completed the necessary paperwork to formally withdraw on February 7, or whether the decision to withdraw was left somewhat up in the air. Just three days after the committee meeting, on February 10, Patrick's mother called the high school and spoke with Principal Dana Brown and shared with her the family's concerns about Patrick's proposed discipline. Patrick had forwarded his mother a series of text messages between a teacher from Mountain Home High School and Jamie. To Mrs. Gentry, these text messages indicated that certain school personnel intended for Patrick to shoulder all the blame for the comments that both he and Jamie had made. *See* Docs. 37-3, p. 3; Doc. 37-16. Also, by that time, Mrs. Gentry had discovered that Jamie had been permitted to return to school without further punishment, but Patrick had been faced with the choice of expulsion or transferring to the ALE.

Mrs. Gentry met with Principal Brown on February 11, the day after the phone call. Several other persons joined the meeting, including Vice Principals McCarn and Blevins, School Resource Officer Jones, and Coach Blevins. Mrs. Gentry described Principal

5

Brown as "very, very upset . . . and very angry" because "Officer Jones told her it was obvious that Patrick never intended any harm . . . ." (Doc. 37-4, pp. 6-7). Mrs. Gentry asked Principal Brown for a copy of Patrick's discipline record, since it was apparently not discussed during the February 7 committee meeting.[3] Principal Brown told Mrs. Gentry that the school may not have the record anymore. (Doc. 37-3, p. 3). But at a later point in the meeting, someone procured the discipline file and delivered it to Principal Brown. *Id.* at 4. Mrs. Gentry then asked if there were any notes from Vice Principal McCarn's interrogation of Patrick from January 22, and she was told there were not. Mrs. Gentry also asked all those assembled why Jamie did not receive the same punishment as Patrick. *Id.* She claims she did not receive an answer. At the end of the meeting, Mrs. Gentry told the Principal that she wanted to resume the disciplinary committee meeting and "get a decision." (Doc. 37-3, p. 4). She did so with the apparent understanding that Patrick's withdrawal from Mountain Home High School was not final, and that she did not need "to do anything to either stop the withdrawal process or to reenroll Patrick as a District student." *Id.*[4]

---

[3] The District fails to provide any material evidence to dispute the Gentrys' assertion that Patrick's prior disciplinary history, which included, for the most part, a handful of tardies to class, *see* Doc. 34-14, was ever considered by the committee. Although one of Patrick's teachers who sat on the committee, Mrs. Wegerer, testified in her deposition that, in her opinion, during Patrick's senior year—as compared to his junior year—Patrick "seemed to make poor choices here and there," she did not testify that she shared her opinions with the committee. (Doc. 34-13, p. 5). Furthermore, Vice Principal McCarn testified that the committee did not "in any way" use Patrick's prior disciplinary reports in fashioning the discipline assigned to Patrick. *See* Doc. 37-13, p. 8.

[4] Also, the following exchange, which took place during Patrick's mother's deposition, indicates her confusion over whether or not Patrick had formally withdrawn from school as of February 7:

6

Patrick's disciplinary committee reconvened the following morning, February 12. Again, the committee met before Patrick and his parents were allowed to enter. When the Gentrys joined the meeting, they were informed that the recommendation was the same: expulsion or the ALE. The summary judgment record contains handwritten notes that the District represents were taken during the meeting, *see* Doc. 34-12, p. 2, possibly by Principal Brown, who was not a committee member, but was nonetheless present. The notes indicate that the Gentrys asked the committee: "why did girl get different punishment." *Id.* At the end of the meeting, Patrick's parents voiced their disagreement with the committee's decision and refused to sign a form that Principal Brown prepared that contained a brief description of the incident involving Patrick, as well as the final recommendations of the committee. (Doc. 34-12, p. 1). Mrs. Gentry claims she refused to sign the form because she believed Principal Brown's "description of the incident included statements Patrick denied saying." (Doc. 37-3, p. 5).

Mrs. Gentry also told Principal Brown that she wanted to appeal the committee's decision, and Principal Brown advised her that she would contact the Assistant Superintendent on her behalf. Principal Brown admits that she gave nothing in writing to Mrs. Gentry that explained the proper steps that a parent should follow in seeking review

---

Mrs. Gentry: But they never told me I had to reenroll [him]. I told them he wanted to come back to school. We wanted a decision. And they never sent us through any kind of enrollment process or anything like that.

Counsel: You asked to come back to Mountain Home School District?

Mrs. Gentry: Yes. That's why we had the meeting on 2-12. Why would they have had a meeting for a disciplinary action of a student that was no longer there.

(Doc. 37-4, p. 9).

7

of the committee's decision. *See* Doc. 37-9, pp. 16-17. The only option she mentioned to Mrs. Gentry was appealing to the Superintendent. Instead of notifying him, though, Principal Brown contacted the Assistant Superintendent, Leigh Ann Gigliotti, and communicated to her the Gentrys' dissatisfaction with the committee's decision. *Id.* at 11. Vice Principal McCarn also testified that he did not specifically recall who forwarded the committee's recommendation to the Assistant Superintendent for review, but he believed that someone did. (Doc. 37-13, p. 21).

Mrs. Gentry met in person with Assistant Superintendent Gigliotti after the committee's February 12 decision, and told her what had happened, including the family's complaint that Jamie had been treated more favorably than Patrick due to her gender. According to Mrs. Gentry, the Assistant Superintendent informed her she would review the matter and make a decision by the end of the day. (Doc. 37-2, p. 5). That same afternoon, the Assistant Superintendent called Mrs. Gentry and told her the decision of the committee would stand. *Id.* There is no information in the record to indicate what evidence, if any, the Assistant Superintendent reviewed, and the Assistant Superintendent's deposition—if it was taken—is not included in the record. Moreover, all of the committee members were deposed, and none of them testified that they forwarded anything in writing to the Assistant Superintendent for her review.

After the Assistant Superintendent told Mrs. Gentry that the committee's decision was approved, Mrs. Gentry requested to speak with the Superintendent about Patrick's case, since the Gentrys still disagreed with the recommendation. According to Mrs. Gentry, the Assistant Superintendent told her that she would make sure the Superintendent got the message. He apparently never did. The Superintendent, Dr.

8

Lonnie Myers, testified during his deposition that he remembered a single telephone conversation with Principal Brown, prior to Patrick's disciplinary committee meeting, "about a placement at Guy Berry," (Doc. 37-14, p. 5), but he claims he never received anything in writing about Patrick's or Jamie's specific cases, and he was never provided with the facts, documents, or other evidence that was reviewed by the disciplinary committee, *id.* at 6. Dr. Myers also admitted that he had no knowledge of any of the facts supporting the committee's recommendation to expel Patrick or else transfer him to the ALE. All Dr. Myers could recall was that a student had made "a threat to a student and a threat to a teacher." *Id.* at 9. He further testified that neither the Principal, the Assistant Superintendent, nor any disciplinary committee member ever asked him to review the committee's decision, *id.* at 13; and he was never informed that the Assistant Superintendent met with Mrs. Gentry after February 12, or that Mrs. Gentry wanted to speak with him, *id.* at 11-12. Nevertheless, Dr. Myers agreed that the Assistant Superintendent may have been vested with the authority to overrule the committee's recommendation in his absence. *Id.* at 12.

After Mrs. Gentry met with the Assistant Superintendent, she tried to set up a meeting with the Superintendent by calling his office "repeatedly" over the next two weeks. (Doc. 37-3, p. 6). At that point, Patrick had been out of school for around a month. When she failed to hear anything from the Superintendent, Mrs. Gentry decided to enroll Patrick in the Flippin School District, where he completed his senior year and then began attending the University of Arkansas. Mrs. Gentry admits that she never appealed the committee's final decision in writing to the Superintendent, nor did she send a written appeal to the school board. By the same token, Principal Brown admits that she only told the Gentrys

9

orally "that they could go to the Superintendent" to appeal if they were dissatisfied with the committee's decision, (Doc. 37-9, p. 15), and she never informed them this request should be in writing or should otherwise be directed to the school board, *id.* at 16.

Turning now to Patrick's claims for relief, they are made pursuant to Title IX, as codified at 20 U.S.C. §§ 1681-1688, and 42 U.S.C. § 1983. Beginning with the Title IX claim, Patrick contends that school officials administered a more severe punishment to him, as compared to Jamie, for making the same sorts of statements, and that the disparate punishment he received was motivated by gender, or that gender discrimination was the source of his alleged deprivations.

As for Patrick's § 1983 claims, he maintains that the District violated his constitutional rights to equal protection and to due process. The Equal Protection Clause of the Fourteenth Amendment prohibits the state from discriminating against an individual due to gender. The Due Process clause requires that sufficient process be afforded one whose protected life, liberty, or property interest is at stake. Here, Patrick argues in opposition to summary judgment that the District had a policy or custom of discriminating on the basis of gender, and that the administrative process that he received concerning how he was disciplined in response to this incident was fundamentally flawed, incomplete, and violative of his constitutional rights. Below, the Court will begin its discussion by reviewing the legal standard required when considering a motion for summary judgment. Then, the Court will consider the District's arguments in favor of dismissing the Title IX,

§ 1983, and compensatory and punitive damages claims, which are the only claims left in the case,[5] and Patrick's responses to those arguments.

## II. LEGAL STANDARD

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.,* 49 F.3d 399, 401 (8th Cir. 1995). The moving party has the burden of showing the absence of a genuine issue of material fact and that they are entitled to judgment as a matter of law, but the nonmoving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts to raise a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). The Court must view all evidence and inferences in a light most favorable to the nonmoving party. *See McCleary v. ReliaStar Life Ins. Co.,* 682 F.3d 1116, 1119 (8th Cir. 2012). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a Court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris,* 550 U.S. 372, 380 (2007).

---

[5] Previously, the Court struck Patrick's prayer for injunctive relief due to mootness. *See* Doc. 33.

11

### III. DISCUSSION

### A. Title IX Claim

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). "Title IX claims arising from disciplinary hearings can generally be challenged under two categories: erroneous outcome and selective enforcement. Under either standard, a plaintiff must show that gender bias was the source of the deprivation." *Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048, 1065 (S.D. Ohio 2017) (citing *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714-15 (2d Cir. 1994)). Patrick's claim is one for selective enforcement, which may be pursued through a private right of action "for monetary damages as well as injunctive relief." *Yusuf*, 35 F.3d at 714 (citations omitted).

The District contends that Patrick's Title IX claim should be dismissed as a matter of law. When analyzing the validity of the claim, the Court first observes that "regardless of the student's guilt or innocence, [if] the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender," then liability will be established under Title IX. *Id.* As "Title IX bars the imposition of [school] discipline where gender is a motivating factor in the decision to discipline," *id.* at 715, in order for Patrick's Title IX claim to survive summary judgment, there must exist genuine, material disputes of fact as to whether he received disparate punishment as compared to a similarly-situated comparator, and whether that punishment was motivated by his gender. Since courts have often interpreted Title IX "by looking to the body of law developed under Title VII, as well

as the caselaw interpreting Title VII," it follows that proof of discriminatory intent will be necessary to establish the validity of the Title IX claim, just as such proof of intent is needed in order to establish the validity of a Title VII claim. *Id.* at 714 (citing *Mabry v. State Bd. of Cmty. Colls.*, 813 F.2d 311, 316 (10th Cir. 1987) ("We find no persuasive reason not to apply Title VII's substantive standards regarding sex discrimination to Title IX suits.").

Even if Patrick succeeds in establishing disparate treatment and intentional discrimination by the District, because a private right of action is not explicit in Title IX but is only judicially implied, "a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). The Supreme Court has explained that putting the school district on notice about the alleged discrimination must be a prerequisite to recovery in a private right of action, since, "[a]s a general matter, it does not appear that Congress contemplated unlimited recovery in damages against a funding recipient where the recipient is unaware of discrimination in its programs." *Id.* at 285.

The District in its Brief in Support of its Motion for Summary Judgment contends, first, that Patrick voluntarily withdrew from the District on February 7, before the disciplinary committee issued a final decision, and therefore, he could not have suffered any intentional discrimination due to his gender based on the District's decision. This argument is clever, but ultimately unpersuasive to the Court in view of the many genuine, material disputes of facts that exist as to this issue. The question of whether Patrick formally withdrew from school on February 7—and whether the matter of his discipline was officially and finally

13

closed or remained open for further consideration and remediation—is certainly contested by the parties and therefore cannot be finally determined by the Court on summary judgment. Importantly, the District does not dispute that Mrs. Gentry discovered *after the February 7 meeting* the recommended discipline, or lack thereof, that Jamie received for committing essentially the same offense. Therefore, Mrs. Gentry only discovered the facts that led her to deduce that Patrick had suffered intentional discrimination due to his gender after his meeting ended on February 7.

Another reason why a dispute of fact exists as to whether Patrick formally withdrew on February 7 is the fact that the Exit/Withdrawal Form that he completed did not contain all required signatures. There are facts in the record that indicate that District officials, including the Principal of Patrick's high school, continued to discuss with the Gentrys the matter of Patrick's punishment and the possibility of discrimination after the date he allegedly withdrew, and the District has offered no explanation as to why it would have taken such actions unless the matters of Patrick's punishment, alleged gender discrimination, and alleged deficiencies concerning due process were still under active consideration. Principal Brown admits that she took a meeting in her office on February 11 with Mrs. Gentry—and with other members of the disciplinary committee—to discuss Mrs. Gentry's allegations of gender discrimination and her charge that her son had not received due process. Then, the disciplinary committee was reconvened on February 12, with Patrick and his parents in attendance, in order to issue a final decision on the issue of Patrick's punishment. It is therefore for the jury to decide whether the reconvening of the committee and the issuance of a final decision on February 12 indicates that Patrick had not fully and finally withdrawn five days earlier, or whether Patrick was continuing to

14

face either the possibility of further discipline or potential reenrollment from February 7 to February 14, by virtue of the committee's reconsideration of the issues.

The undisputed evidence in the record reveals that Mrs. Gentry appealed the final decision of the committee to the Assistant Superintendent, which is a fact that the jury may consider in determining whether or not Patrick formally and finally withdrew on February 7—and thus could not have suffered intentional discrimination at the District's hands prior to, on, or after that date. The evidence further indicates that the Assistant Superintendent reviewed the committee's decision in the span of a single afternoon, at most, and apparently never passed on to the Superintendent the fact that Mrs. Gentry wished to appeal further.

As for the issue of notice, a genuine, material dispute of fact exists as to when the District received notice of Patrick's charge of gender discrimination, and whether the notice it received was sufficiently timely so that the District could have investigated and remedied the alleged discrimination prior to suffering potential exposure to damages in this lawsuit. The District does not dispute that Mrs. Gentry complained about the disparate treatment she perceived that her son received, as compared to his female comparator, on at least February 11 and 12, and a jury could conclude that the notes from the February 12 committee meeting indicate that the committee heard and therefore considered the Gentrys' complaint of gender discrimination. The jury could therefore conclude that the District, through its school administrators, received notice of the charge on February 12, if not prior to that on February 11 during a meeting between Mrs. Gentry and the Principal and Vice Principals.

In addition, the District does not dispute that Mrs. Gentry told the Assistant Superintendent about her charges of disparate treatment, gender discrimination, and failure of due process when they met in person after the February 12 committee meeting. Considering the evidence in the summary judgment record, there is a genuine, material dispute of fact as to whether the Assistant Superintendent possessed the authority to overrule the committee's decision at that time, or else order further investigation by the committee in light of Mrs. Gentry's charges. The Superintendent testified that he believed the Assistant Superintendent may have been vested with the authority to overrule the committee's final recommendation in the Superintendent's absence—which is a fact relevant to whether the District, through the Assistant Superintendent, received notice of the Title IX claim and an opportunity to address it prior to the commencement of litigation.

As for the District's contention that Mrs. Gentry failed to appeal in writing to the school board, as the 2013-2014 Student and Parent Handbook suggests, *see* Doc. 34-3, p. 9, the District has not presented any proof that Patrick and/or his parents received the Handbook prior to the events at issue in this lawsuit. The District has also failed to persuade the Court that the Gentrys' admitted failure to notify the school board as to their claims prior to filing suit necessarily means, as a matter of law, that the District did not receive appropriate notice under Title IX. The notice issue is therefore one for the jury.

With respect to the question of intentional discrimination and disparate treatment, the Court also finds that genuine, material disputes of fact exist. The only argument the District offers as to why Jamie and Patrick were not similarly situated is that they had "differing disciplinary histories and Discipline Advisement Committee members." (Doc. 36, p. 10). However, several of the District's witnesses testified that Patrick's prior disciplinary

16

record was not discussed or considered prior to the committee's recommendation to expel Patrick or transfer him to the ALE. In addition, Mrs. Gentry's testimony is that Patrick's disciplinary record was first retrieved and considered by committee members at her request, on February 11, when she met with Principal Brown, the two Vice Principals, and others at the school. Furthermore, the Court's careful review of the numerous documents, partial depositions of at least a dozen witnesses, and voluminous briefing reveals that the District has offered *no reasons* to date as to why Jamie, a female, was permitted to return to school after her ten-day suspension, and Patrick, a male, was not. By contrast, Patrick has alleged that at least one member of his committee, Vice Principal McCarn—whom the District contends was one of four decision-makers on the disciplinary committee and was the only school administrator who interrogated Patrick prior to his suspension—may have harbored some animus against Patrick due to his gender and/or sexuality. Patrick submitted an affidavit that stated:

> It is my sincere belief that McCarn harbored a bias against me for failing to conform to male stereotypes. I had McCarn for driver education in the 10th Grade. McCarn came into possession of a note between me and a friend that discussed me possibly being gay. In a private conversation, McCarn told me that being gay was "wrong." After learning I may be gay, McCarn mocked me by speaking to me in a feminine voice.

(Doc. 37-1, p. 5). The above allegation is something Vice Principal McCarn surely disputes, but since the issue of whether Patrick suffered intentional gender discrimination cannot be decided except by assessing the credibility of witnesses, the issues of intentional gender discrimination and disparate treatment are ones for the jury.

There is one final topic left to address with respect to Patrick's Title IX claim, and that is the question of whether he was "excluded from participation in" or "denied the

17

benefits of . . . any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). The District maintains that Patrick could have completed his senior year and received his high school diploma if he had attended the ALE. The District has submitted proof that a graduate of the ALE receives the same diploma as a graduate of Mountain Home High School, and an ALE student may be permitted to attend classes that he needs for graduation at Mountain Home High School. Patrick has submitted at least some evidence that a jury could consider in concluding that the ALE provides a significantly inferior education as compared to the high school, particularly for college-bound seniors like Patrick. The Court therefore finds that a genuine, material dispute of fact exists as to whether the District's actions in Patrick's case, if constituting illegal gender discrimination, also excluded him from participation in or denied him the benefits of an education program or activity receiving federal funds. For these reasons, the request for summary judgment as to the Title IX claim is denied, and the claim will go to trial.

## B. Section 1983 Claims

The Fourteenth Amendment of the United States Constitution provides that "[n]o state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. A lawsuit may be brought under 28 U.S.C. § 1983 against a "person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected" a person to the deprivation of any right protected by federal law or the United States Constitution. Below, the Court will

18

consider Patrick's § 1983 claims that he was denied equal protection under the law due to a policy of gender discrimination by the District, and that he was denied procedural due process.

## 1. Equal Protection

"To state a prima facie claim under the Equal Protection Clause of the Fourteenth Amendment, a plaintiff must demonstrate that (1) he is otherwise similarly situated to members of the unprotected class; (2) he was treated differently from members of the unprotected class; and (3) the defendant acted with discriminatory intent." *Greer v. Amesqua*, 212 F.3d 358, 370 (8th Cir. 2000). In other words, to be successful on his equal protection claim, Patrick must establish that he was similarly situated to a female comparator, that he was intentionally treated differently—in an unfavorable way—by the District due to his gender, and that the District lacked any sort of rational basis for the dissimilar treatment.

As previously explained, there remain genuine, material facts in dispute concerning whether Jamie is an adequate comparator to Patrick and whether the two students were similarly situated at the time they were punished by the District. Also, there remain material fact questions as to whether Patrick's previous disciplinary history or "attitude" were considered by his committee before they recommended he be expelled from Mountain Home High School, or else finish his senior year at the ALE.

With all that said, however, the existence of these fact questions is not enough to save Patrick's equal protection claim from dismissal. The Eighth Circuit has interpreted the Supreme Court's decision in *Monell v. Department of Social Services*, 436 U.S. 658 (1978),

19

to mean that school districts are subject to municipal liability. *See Doe v. Sch. Dist. of Norfolk*, 340 F.3d 605, 613 (8th Cir. 2003) ("[E]ntities such as the School District can only be sued under § 1983 if 'the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers,'" or if the action constitutes a "deprivation of a constitutional right pursuant to a governmental 'custom.'" (quoting *Monell*, 436 U.S. at 690-91)). In other words, when an individual sues a school district under § 1983, as Patrick has done here, he must establish that the alleged constitutional violation was committed pursuant to an official "policy or custom" of the school district, and that the policy or custom "was the 'moving force [behind] the constitutional violation.'" *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999) (quoting *Monell*, 436 U.S. at 694).

A "policy" is "a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Id.* A "custom" is a "continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees . . . ." *Id.* (quotation and citation omitted). In the case at bar, Patrick has brought forward no evidence of the existence of a widespread, persistent pattern—a custom, in other words—of the District to discriminate against students due to their gender. The only example of alleged gender discrimination that Patrick can point to is his own. He does attempt to argue, though, that the District promulgated an unconstitutional *policy* of gender discrimination at the moment that the Assistant Superintendent—cloaked, perhaps, with the policy-making authority delegated to her at the time by the Superintendent—signed off on the recommendations of Patrick's disciplinary

20

committee. But when a policy-maker makes a decision about an individual case or set of circumstances, this is not necessarily the same as when the policy-maker establishes an official policy on behalf of the municipality.

There is a certainly a distinction to be drawn between policy-making and decision-making. In particular, the Eighth Circuit in *Davison v. City of Minneapolis*, 490 F.3d 648, 660 (8th Cir. 2007), noted that "'[t]he fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.'" (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-82 (1986)).

At most, the evidence before the Court shows that the Assistant Superintendent may have been temporarily vested with the decision-making authority to overrule the committee's final recommendation in the Superintendent's absence. Patrick has produced no evidence that would tend to create a genuine, material dispute of fact as to whether the Assistant Superintendent possessed the authority to make policy decisions on behalf of the District, or that she actually created a policy with respect to student discipline. Likewise, Patrick is unable to show that the Superintendent instituted a policy or policies that were the moving force behind Patrick's claim of gender discrimination. For these reasons, the equal protection claim is dismissed with prejudice.

### 2. Due Process

Patrick's § 1983 claim for procedural due process violations could only be cognizable if the punishment imposed upon him, that is, mandatory attendance at the ALE in lieu of expulsion, was equivalent to depriving him of the right to a public high school

education. The Supreme Court in *Goss v. Lopez*, 419 U.S. 565, 574 (1975), held that "the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause." Here, Patrick does not contend that he failed to receive appropriate due process prior to being suspended for ten days; instead, he argues that when he came back to school after the ten-day suspension, he was not given adequate notice that the disciplinary committee was considering further punishment, to include expulsion or transfer to the ALE, and he was not afforded the opportunity to tell his side of the story prior to the imposition of punishment by the disciplinary committee. Finally, he contends that the Assistant Superintendent's review of the committee's recommendation was not meaningful but was merely a "rubber stamp" of the committee's decision.

In general, "[t]o establish a procedural due process violation, a plaintiff must first demonstrate that he has a protected liberty or property interest at stake. Secondly, a plaintiff must prove that he was deprived of such an interest without due process of law." *Marler v. Mo. State Bd. of Optometry*, 102 F.3d 1453, 1456 (8th Cir. 1996) (internal citations omitted). "Due process requires adequate notice and an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* (quoting *Post v. Harper*, 980 F.2d 491, 493 (8th Cir. 1992)). Accordingly, the only way Patrick's due process argument survives summary judgment is if there is a genuine, material fact question as to whether "the education received at the alternative school is significantly different from or inferior to that received at his regular public school." *Buchanan v. City of Bolivar, Tenn.*, 99 F.3d 1352, 1359 (6th Cir. 1996); *see also Chyma v. Tama Cnty. Sch. Bd.*, 2008 WL 4552942,

22

at *3 (N.D. Iowa Oct. 8, 2008) ("It appears to be the consensus of the circuits, however, that placement in an alternative school does not implicate procedural due process rights unless there is a showing that the education provided by the alternative school is substantially inferior.").

The Court believes Patrick has raised a genuine, material question of fact as to whether completing the last few months of his senior year at the ALE—considering that he had already been accepted to college and needed to complete certain mandatory curriculum requirements for college—would have been significantly different from or inferior to the education he would have received at Mountain Home High School. There is evidence in the record that the ALE did not offer many, if any, of the courses Patrick was taking during his last semester at Mountain Home High School, and that it did not offer certain classes Patrick needed to take, not simply to graduate, but to graduate and attend the colleges to which he had been provisionally accepted. Further, there is a question of fact as to whether the District agreed that if Patrick attended the ALE, it would transport him to the high school to complete the courses that he needed to attend college. Because these questions of fact and others remain, the Court cannot conclude as a matter of law that the decision of the disciplinary committee to relegate Patrick to the ALE for the last months of the final semester of his senior year did not implicate a valuable property interest.

Next, there is a genuine, material question of fact as to whether Patrick and his parents received meaningful notice of the nature of the proceedings set to take place during the disciplinary committee meeting on February 7, and whether Patrick was ever afforded the opportunity to present his side of the story before the committee rendered its

decision. Beginning with the issue of notice, Patrick and Mr. and Mrs. Gentry all testified that they arrived at the February 7 disciplinary committee meeting without having received notice that the purpose of the meeting was to contemplate further discipline. The disciplinary referral that was sent home with Patrick (Doc. 34-4) states nothing about the disciplinary committee or the fact that other punishment in addition to the ten-day suspension was contemplated. Vice Principal McCarn's notes from January 22 indicate that he mentioned the meeting orally to Patrick and Mrs. Gentry, and that Patrick immediately selected two teachers to serve on his committee; however, Vice Principal McCarn did not claim in his deposition that he explained to the Gentrys the purpose of the committee meeting. The Gentrys believed that the only purpose of the meeting was for the committee to confirm that Patrick performed his community service obligations and obtain make-up work for the period of suspension. It is therefore for the jury to determine whether Patrick was given meaningful notice of the February 7 disciplinary committee meeting.

Turning to the issue of whether Patrick was given a meaningful opportunity to present his side of the story to the committee, the record is fragmented and spotty concerning exactly what Patrick and his parents said, or had the opportunity to say, at the committee meetings on February 7 and February 12. Similarly, the excerpts of the committee members' depositions that were presented to the Court shed little to no light on whether Patrick was given an opportunity to tell his side of the story during either meeting. In fact, Principal Brown testified that she did not know whether Patrick told his side of the story. *See* Doc. 37-9, p. 13.

Some evidence in the record indicates that the committee met early on February 7, without Patrick and his parents, and the decision-makers on the committee had already

24

decided at that time that Patrick would be expelled, or else given the option to transfer to the ALE. According to Mr. Kincade, the Director of the ALE, he was asked to attend Patrick's February 7 meeting, but "before . . . the meeting" took place with Patrick and his parents, the committee met separately with Mr. Kincade, and one of the Vice Principals stated that the final decision regarding Patrick's discipline had already been made, and that the committee "ha[d] to recommend for expulsion . . . ." (Doc. 37-11, p. 4).[6] A jury should therefore have the opportunity to evaluate the evidence the decision-makers on the committee relied on in deciding Patrick's punishment, and whether Patrick had a meaningful opportunity to present his side of the story to the committee prior to them making their decision. Summary judgment on the due process claim is denied.

### C. Damages

The District contends that Patrick has failed to provide it with sufficient evidence from which it may deduce the nature of his claim for either punitive damages or compensatory damages. Patrick responds that he has already disclosed to the District in discovery the nature of all the damages he will seek at trial, and he references in his briefing certain responses he made to the District's interrogatories and document requests. See Doc. 34-18, pp. 7-8.

Beginning with the issue of punitive damages, the dispositive issue is that the District is the only named Defendant. The Supreme Court has held that punitive damages are not recoverable against a municipality in a § 1983 action. City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981). And although the Eighth Circuit has not spoken

---

[6] Mr. Kincade confirmed that he was not invited to attend Jamie's disciplinary committee meeting. Id. at 17.

as to the availability of punitive damages in a Title IX action, the Court agrees with the reasoning of the Northern District of Iowa that no punitive damages claim may lie against a school district under Title IX, absent express statutory authority. *See Schultzen v. Woodbury Cent. Comm. Sch. Dist.*, 187 F. Supp. 2d 1099, 1109-28 (N.D. Iowa 2002); *City of Newport*, 453 U.S. at 261 n.21 ("The general rule today is that no punitive damages are allowed unless expressly authorized by statute."). Multiple other district courts have held likewise. *See, e.g., Doe 20 v. Bd. of Educ. of Cmty. Unit Sch. Dist. No. 5*, 680 F. Supp. 2d 957, 995 (C.D. Ill. 2010) (citing to the reasoning in *Schultzen* and finding that punitive damages cannot be claimed against a municipality under Title IX); *Plamp v. Mitchell Sch. Dist. No. 17–2*, 2008 WL 2277519, at *12 (D.S.D. June 3, 2008) (same); *Doe v. Omaha Pub. Sch. Dist.*, 2005 WL 2347284, at *6 (D. Neb. Sept. 26, 2005) (same). The punitive damages claim is therefore dismissed.

As for Patrick's compensatory damages claim, the Court is disinclined to dismiss it on summary judgment. The Court agrees with the District that all documents supporting Patrick's claim for compensatory damages should have been produced by now in discovery, and that it is unlikely Patrick would be permitted to introduce new, previously undisclosed evidence in support of his damages claim at trial. Although it appears from the record that Patrick's proof of damages is rather scant, little proof is not the same as no proof, and the Court cannot dismiss the compensatory damages claim on the record before it.

## IV. CONCLUSION

For the reasons described herein, **IT IS ORDERED** that Defendant Mountain Home School District's Motion for Summary Judgment (Doc. 34), is **GRANTED IN PART AND DENIED IN PART**. The Equal Protection claim under 42 U.S.C. § 1983 and the claim for punitive damages are both **DISMISSED**. This leaves for trial the Title IX claim and the Due Process claim under § 1983.

**IT IS SO ORDERED** on this 9th day of May, 2018.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE